FC33ADAH                        Hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ADAR BAYS, LLC,

4                    Plaintiff,

5            v.                              15 CV 8860 (RA)

6   PUGET TECHNOLOGIES, INC., et
    al.,
7
                     Defendants.
8
    ------------------------------x
9                                            New York, N.Y.
                                             December 3, 2015
10                                           2:00 p.m.

11  Before:

12                      HON. RONNIE ABRAMS,

13                                           District Judge

14                        APPEARANCES

15  GARSON, SEGAL, STEINMETZ, FLADGATE LLP
         Attorneys for Plaintiff
16  BY:  KEVIN MURPHY
          MICHAEL M. STEINMETZ
17
18  THE FUNES LAW FIRM
         Attorneys for Defendants
    BY:  ALEJANDRO D. FUNES, Appearing via speakerphone
19

20

21

22

23

24

25

FC33ADAH                          Hearing

1          THE DEPUTY CLERK:  In the matter of Adar Bays LLC v.

2     Puget Technologies.  Parties, please state your name for the

3     record.

4          MR. MURPHY:  Good afternoon, your Honor.  Kevin Murphy

5     of the law firm Garson, Segal, Steinmetz, Fladgate on behalf of

6     plaintiff.  With me is Michael Steinmetz from the same firm.

7          THE COURT:  Good afternoon.

8          MR. FUNES:  Alex Funes from the Funes Law Firm on

9     behalf of the defendants Puget Technologies and Hermann

10    Burckhardt.

11         THE COURT:  Good afternoon, Mr. Funes.  Just so that

12    you know, in the future I will not allow you to participate by

13    phone except in extraordinary circumstances, particularly when

14    it is something that's substantive in nature.  But I understand

15    that you have asserted that you received these papers just very

16    last minute.

17         I did want to ask you though about the status of your

18    effort to be admitted pro hac vice.

19         MR. FUNES:  Yes, your Honor.  Thank you again for

20    letting me appear by phone given the short notice.  My status

21    with my pro hac vice, I had to file a second motion.  The

22    status of that is that the certificate of good standing from

23    the State of Florida takes three to five days for me to receive

24    it, and I will have to file a third motion including the

25    certificate from the bar.  Because right now, the motion that I

FC33ADAH                         Hearing

1    filed, I have to include a temporary correspondence from the

2    Florida Bar stating I am a member in good standing.  And what I

3    will be able -- the petition will go through the latest by

4    Monday I believe.

5            THE COURT:  All right.  I'm sorry.  See, this is the

6    problem with doing it on the phone.  I had trouble hearing you.

7    The Monday after?

8            MR. FUNES:  It would be this coming Monday.

9            THE COURT:  On Monday.  Is that what you said?

10           MR. FUNES:  Correct.

11           THE COURT:  Okay.

12           MR. FUNES:  And I did file two motions, your Honor.

13   They were denied by the clerk because the certificate issued by

14   Florida was not issued by -- it was a temporary certificate

15   issued by e-mail.  And I will get the original certificate from

16   the Supreme Court by U.S. mail, which I should receive either

17   today, tomorrow, or Monday.

18           THE COURT:  All right.  In light of the exigency of

19   these proceedings, I'll admit you pro hac vice subject to you

20   making the proper filing by the end of next week.  If there is

21   a continued issue with that timing, I want a specific

22   application for additional time.

23           MR. FUNES:  Certainly, your Honor.  Thank you very

24   much.

25           THE COURT:  So, you now have all of the papers,

FC33ADAH                         Hearing

1    Mr. Funes, is that correct?  Both the complaint and the motion

2    for preliminary injunction and for preliminary declaratory

3    relief, correct?

4             MR. FUNES:  That is correct, your Honor.

5             THE COURT:  So, we have the papers.  I'll hear from

6    plaintiffs and then I'm happy to hear from you as well.

7             MR. FUNES:  Very well, Judge.

8             MR. MURPHY:  Your Honor, we've submitted the

9    declaration of Aryeh Goldstein on the issues of substantial

10   likelihood of success on the merits, irreparable harm and

11   balance of the equities.  We're happy to swear him in, enter

12   the declaration into evidence, allow your Honor opportunity to

13   question, allow counsel opportunity to cross-examine on the

14   issues.  We have sort of amplified questions of course based

15   upon what Mr. Funes has taken issue with.  So we're happy to

16   proceed.

17            THE COURT:  Why don't you do that.

18            Mr. Goldstein, good afternoon.

19            (Witness affirmed)

20            MR. MURPHY:  Before I begin, I'd like to hand the

21   witness what I've marked as Plaintiff's Exhibit A for

22   identification.

23            THE COURT:  Is this the declaration?

24            MR. MURPHY:  This is his declaration.

25            THE COURT:  Yes.

FC33ADAH                    Goldstein - direct

1    ARYEH GOLDSTEIN,

2         called as a witness by the Plaintiff,

3         having been duly affirmed, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. MURPHY:

6    Q.  Mr. Goldstein, can you tell us what you do.

7    A.  Yes, I am an investor together with one partner.  We fund

8    public companies under Rule 144.  And we've been funding this,

9    we do since this prior to 2000, for a very long time.  We fund

10   different exemptions, we fund different public companies money

11   who need it.

12   Q.  You accomplish this funding through Adar Bays LLC?

13   A.  Yes.

14   Q.  Where is Adar Bays located?

15   A.  It's in 3311 I believe Indian creek.  Miami, Florida.

16   Q.  Where do you live, sir?

17   A.  I live in New York.

18   Q.  Does Adar Bay does any business in New York?

19   A.  Almost exclusively.  That's the reason -- my partner

20   actually moved down to Florida a couple of years ago, which is

21   why, he's more the pencil pusher, that's why it is there.  All

22   my meetings happen here in the city.  I myself have an office

23   in Monroe, and my home office in Rockland County.

24   Q.  What is the significance of doing business in New York?

25   A.  Virtually every company we meet comes here to the city, and

FC33ADAH                    Goldstein - direct

1    we either make new connections or establish and strengthen

2    continuous connections.  The same company repeat, and we do it

3    again, and do we make new and strengthen old connections and

4    it's always been in the city.  It is the financial capital.

5    Q.  Are you familiar with a dispute that's the subject matter

6    of this case that is between Adar Bays and Puget Technologies?

7    A.  Yes.

8    Q.  Have you submitted a declaration in connection with the

9    dispute?

10   A.  Yes.

11   Q.  Is that the declaration before you marked as Exhibit A, is

12   that right?

13   A.  Yes, correct.

14   Q.  I'd like you to go to page 14 of that declaration.

15          THE COURT:  Can I just break in and just ask one

16   question of Mr. Funes.

17          Mr. Funes, are you contesting that jurisdiction is

18   proper in this court?

19          MR. FUNES:  Yes, we do, your Honor.  After the Court

20   entered the order yesterday and throughout the case, really, we

21   were prepared to dispute the jurisdiction, particularly over

22   one of the defendants Mr. Burckhardt, but also over the

23   corporation itself.

24          The agreement has a clause in which the parties waived

25   venue in the forum of litigation.  However, it is our position

FC33ADAH                    Goldstein - direct

1    that that clause may not be enforceable.  At this point we have

2    two companies that are based in Florida, even though Adar has a

3    second office in New York.  Most of the witnesses that will be

4    called to testify in this case are based in Florida.  The

5    defendant himself is located in Florida.  Any depositions will

6    have to take place in New York and will require those witnesses

7    to travel to the jurisdiction.  This will cause significant

8    costs for both sides to travel and litigate the case.

9              THE COURT:  All right.

10             MR. FUNES:  Aside from that clause, the parties have

11   minimum contact, at least the defendants, with the State of New

12   York.  Very minimal, which I do not believe these contacts

13   either meet the constitutional requirements or any other

14   jurisdictional requirements.

15             THE COURT:  All right.  Thank you.  I'm sorry.  We

16   have to take a short break because my transcript is not up.  I

17   hadn't set up getting realtime and I would like to have a

18   transcript I can look at.  So we are going to take a break

19   momentarily.

20             (Recess)

21             MR. MURPHY:  I would like an opportunity to respond to

22   Mr. Funes' point.

23             THE COURT:  I don't think that's necessary, actually.

24   Because Mr. Funes, I have your letter of December 3rd.  I

25   hadn't read it, but I have now.  But, Section 5 of the contract

FC33ADAH                    Goldstein - direct

1   specifically waives any jurisdiction, any objection to

2   jurisdiction and venue.

3            Mr. Goldstein, you can take the stand again.

4            I don't know exactly how you get around that.

5            MR. FUNES:  Yes, your Honor.  These clauses are not as

6   strictly enforceable all the time.  Particularly when it

7   endangers public jobs.  It is more convenient for the litigants

8   to, to argue the case in another jurisdiction.  As I stated --

9            THE COURT:  So it is a forum non conveniens argument.

10            MR. FUNES:  Correct.

11            THE COURT:  I'm rejecting that argument and we're

12   going to proceed.  I didn't mean to interrupt the direct of

13   Mr. Goldstein.

14            MR. FUNES:  Very well.

15            THE COURT:  You may proceed, Mr. Murphy.

16   BY MR. MURPHY:

17   Q.  I believe where we left off, Mr. Goldstein, is we were

18   talking about your familiarity with the dispute between Adar

19   Bays and Puge.  Is that right?

20   A.  That's correct, yes.

21   Q.  You're fully familiar with that?

22   A.  Yes.

23   Q.  I think I directed you to page 14.  And if you can tell me

24   if that page bears your signature on the declaration?

25   A.  Yes, it does.

FC33ADAH                    Goldstein - direct

1   Q.  All of the exhibits that are attached to the declaration,

2   you reviewed and considered before signing that declaration, is

3   that correct?

4   A.  That's correct, yes.

5   Q.  Is the declaration and all of its contents and your

6   assertions made about the contents of the declaration,

7   including the exhibits, true, correct, and complete?

8   A.  Yes.

9           MR. MURPHY:  Your Honor I offer up the declaration of

10  Mr. Goldstein.

11          THE COURT:  Yes, it will be admitted.

12          (Plaintiff's Exhibit A received in evidence)

13  Q.  Mr. Goldstein, Mr. Funes has put in some opposition papers

14  where he has asserted that Adar Bays conducted itself by

15  misrepresenting and committing fraud upon Puge and the Court.

16  Is that true?

17  A.  Absolutely not.

18  Q.  Have, has Adar Bays ever acted with another entity to

19  simultaneously request conversions from Puge Technologies?

20  A.  Not with conversions and not with selling, never.

21          THE COURT:  Can you just explain the relationship

22  between Adar Bays and Union Capital.

23          THE WITNESS:  We're a competitor, we're competitors

24  and complementers, so to speak.  We both do the same business.

25  But it is very often a company that needs a lot of money.  We

FC33ADAH                    Goldstein – direct

1    don't want to lay out the risk of that much money.  Let's say

2    they need a million or half a million dollars.  So we do part

3    of it and they farm it off to other people.  Other people join

4    and do the deal.  Once we do close the deal, we have nothing to

5    do with each other until afterwards, until the next deal.  We

6    never work in concert with selling, nothing to do with each

7    other in that part.

8    Q.  Puge also accused Adar Bays of securing commissions on the

9    deal that is the note between Adar Bays and Puge.  How do you

10   respond to that?

11   A.  There is no such thing.  We have terms of the deal.  We

12   don't take any commissions from anybody.

13   Q.  Mr. Goldstein, if you did not get the requested relief in

14   this case, that is, the ability to enforce conversions, what

15   would happen?

16   A.  There is a very real risk that we'll lose our money in the

17   deal and the company itself may not be viable.  There is a real

18   risk, it has happened in the past, and we look to prevent that

19   from happening now, and that's why we take these measures.

20   Q.  Why do you say there is a real risk in this instance?

21   A.  Because the company that doesn't honor their commitments,

22   the word gets out to that effect, and they have a very hard

23   time raising money, they can't survive or have a harder time

24   surviving, I should say, and it is then, if they can't raise

25   the money, they can't stay current or they can't issue shares

1   and they slowly drift way.  It's happened to me more than a

2   dozen times.  We're not looking -- it is a risky business.

3   We're trying to keep the risk, you know, contained somewhat.

4   Q.  One aspect of the note refers to a reserve requirement.

5   Can you explain that to the Court.

6   A.  Yeah.  When we fund a company, just for numbers sake, if we

7   give a company $100,000.  When we fund a company, the company

8   is $100,000 stocks and at a dollar a share.  Normally we get

9   the shares at a discount market.  Let's say at 30 percent

10  discount 40 percent discount, we would need 140,000 shares give

11  or take.  Oftentimes a company goes ahead and raises other

12  money or --

13          THE COURT:  Talk really loudly and clearly and slowly

14  into the microphone particularly because Mr. Funes isn't going

15  to hear you at all if you are not in the mike.

16  A.  Sure.  So, to allow for volatility in these stocks, we ask

17  for a reserve that they shouldn't go ahead and give out shares

18  to other people, and we will be left without any shares when it

19  comes time to conversion.  So we tell them up front we need a

20  reserve maintained at the transfer agent in case the stock

21  should have a drop, we'll have coverage to a certain amount.

22  Similar to like a bank won't lend money on a house without

23  having maintained proper security.  It is the same idea.

24  Q.  Why did you ask that the Court order Puge to increase its

25  reserve by issuing additional shares?

FC33ADAH                         Goldstein – cross

1   A.   We're asking, well, it is the easiest way for the company

2   to satisfy its obligation and certainly a quicker way.  Nothing

3   is speedy, but it is certainly a quicker way by increasing the

4   authorized shares, it doesn't cost them money, it is something

5   that's 90 percent they'll get right through within a matter of

6   weeks.  When you raise money, it could take a very long time,

7   commitments never happens, it schleps for months and even

8   longer.

9            So the simplest way to take care of the situation is

10  by increasing the authorized and giving the shares as it's

11  provided for in the documents.

12           MR. MURPHY:  I have no further questions, your Honor.

13           THE COURT:  Mr. Funes, do you have any questions for

14  Mr. Goldstein?

15           MR. FUNES:  Yes, I do, your Honor.

16           THE COURT:  Again, just very slowly and clearly in the

17  questions because we're having trouble hearing you on the

18  phone.  Thank you.

19  CROSS-EXAMINATION

20  BY MR. FUNES:

21  Q.   Mr. Goldstein.

22  A.   Yes.

23  Q.   What is the amount of the contract?  What is the amount of

24  the total debt that is owed under this agreement?

25  A.   The initial contract is for $75,000, and there is

FC33ADAH                    Goldstein – cross

1   roughly -- I don't have the numbers in front of me -- roughly

2   50,000 plus to still convert.  Plus interest and plus at this

3   stage of the game penalties as well.

4   Q.  Okay.  So, Puget already complied with one-third of the

5   total amount owed, correct?

6   A.  Correct.

7   Q.  Okay.  And Puget also honored prior issuance of shares so

8   that your company could convert those shares pursuant to the

9   contract, correct?

10  A.  Correct.

11  Q.  And those, those issuances of stock happened without

12  incident, correct?

13  A.  Correct.

14  Q.  Let me ask you something about the contract.

15  A.  Sure.

16  Q.  Did the contract contemplate any problems with reaching the

17  maximum amount that a company could issue at any given point?

18  A.  Can you just ask the question one more time, please?

19  Q.  Yes.  Did the contract contemplate any problems if a

20  company, in this case Puget, could not raise the required

21  shares because of -- because having reached a maximum number of

22  shares for selling on the offer of shares it could issue, did

23  the contract contemplate that problem?

24  A.  There is different options for the company.  But the one,

25  the obvious one is to increase the authorized shares which

1    takes care of the problem.  It is just like running out of

2    checks, you order more checkbooks.  That's the one way.

3    Oftentimes companies have reserves for other investors that

4    have converted out of their position.  They no longer have it

5    so they can free up those reserves.  So there's different

6    methods how to handle a situation.

7    Q.  Right.  Yeah, I understand.  But the agreement did not

8    anticipate or did not specify what the company would do if it

9    reached the maximum amount of shares that it could issue,

10   correct?

11   A.  Correct.  But some of the things are more common sense than

12   others.  That would be one of them.

13   Q.  Okay.  Now, in your opinion, any shares that are to be

14   issued by the debtor, in this case Puget, those shares would

15   have to be held by an agent, by a third-party agent, right?

16   A.  Why do you say that?  Either I'm not understanding the

17   question or I'm not catching it.

18   Q.  Okay.  So any shares to be delivered to Adar, those shares

19   are usually delivered by a third-party agent, and in this case,

20   that agent was a third party named Direct Transfer LLC, isn't

21   that true?

22   A.  Yeah, the transfer agent issues the shares.  If that's what

23   you're saying, that's correct.

24   Q.  Okay.  Now, during prior delivery of shares, during the

25   contract, Direct Transfer held those shares in trust and then

FC33ADAH                          Goldstein - cross

1    those shares are delivered to Adar, isn't that right?

2    A.   That's correct, yes.  That's the reserve.

3    Q.   Even if the Court were to order Puget to deliver the

4    shares, Direct Transfer could not comply with the Court order

5    because Direct Transfer would not have those shares in trust as

6    of right now, isn't that right?

7    A.   That's correct.  Yes.

8    Q.   Okay.  Now, did you know that in order to issue additional

9    shares above the ceiling or above the maximum authorized

10   amount, a company has to proceed with a special meeting and

11   obtain shareholder approval?  Did you know that?

12   A.   Yes.

13   Q.   Hello?

14   A.   Yes.

15            THE COURT:  He said yes.

16            MR. FUNES:  Okay.

17   Q.   Now, and that's not something that happens overnight,

18   correct?

19   A.   Correct.

20   Q.   Now, in the contract, and I would refer you, do you have a

21   copy of the agreement by any chance?

22   A.   Yes, I do.

23   Q.   Okay.  Are you familiar with the funding lock up clause on

24   page eight?

25            THE DEPUTY CLERK:  Can you please repeat that?

FC33ADAH                          Goldstein – cross

1              THE COURT:  Can you please repeat that.

2              MR. FUNES:  Yes.

3    Q.  You're familiar with the funding lock up clause in the

4    agreement, right?

5    A.  It's page eight?  I'm familiar with the lock up clause,

6    yes.

7    Q.  In that clause, it says that the company shall not

8    consummate another round of financing for 30 days following the

9    closing of the transactions contemplated herein.  Right?

10   A.  I don't see it, but yes, that is correct.  We did put a

11   lock up clause that whatever amount they were looking to raise,

12   they shouldn't go above that to raise more money which would go

13   ahead and dilute and put a tremendous pressure on the stock.

14   Q.  Right.  And were you aware that the company that you

15   earlier stated used you were complementers, and that's the word

16   you used, you were referring to Union LLC.  Were you aware that

17   Union Capital LLC entered into a similar contract with Puget on

18   or about the same date in which Puget entered into the same

19   contract with your company?

20   A.  Yes, I knew that Puge did a few different deals right

21   around that timeframe, before and afterwards.  Like I was

22   trying to explain, Puge was looking to raise more money than we

23   were looking to give them at that time.  So I understood that

24   was their round, but I didn't want them to do additional rounds

25   because that would have more of a dilutive and pressure on the

FC33ADAH                    Goldstein - cross

1    stock.  That's why we have the lock up for no other rounds

2    besides this round.

3           THE COURT:  Can you explain that a little more fully

4    please again into the microphone?

5           THE WITNESS:  Sure.  When a company looks to raise

6    money, like let's say the one raised a million dollars and our

7    comfort level is $100,000 just for numbers sake.  We understand

8    they'll go around to other people to raise the other 900.

9    Often the company then does another raise and another raise and

10   it becomes a very heavy pressure on the stock.  There is too

11   many dollars out there, people see, it is public knowledge.

12   And we ask for a lock up, give us 30 days, a chance for when

13   the time comes we could sell it, it shouldn't be a lot of

14   pressure following behind.  It is only $1 million selling and

15   not $5 million selling.  Am I being clear?

16          This round they wanted, we did part of the round and

17   other people did the other part.  I understood.  I wasn't

18   comfortable giving them the whole amount they were looking for.

19   I knew they went to Union and other people as well.  It was on

20   the street, so to speak.  That was our comfort level.  We said

21   our next round there should be a 30 day lock up so there

22   shouldn't be another $1 million out.  Things worked beautifully

23   until they turned south on us.  I don't know what happened.

24   Q.  So, if you were to exercise conversion of the shares at a

25   later time, your company would still get paid the $75,000 it is

FC33ADAH                    Goldstein - cross

1  owed, correct?

2  A.  Are you asking that if we convert the shares, we'll

3  continue converting the shares of what's left?  Is that what

4  you're saying?

5  Q.  Yeah.  If you were to convert these shares, assuming they

6  don't.  You would still be able to convert the shares let's say

7  a month, a month from now.  And still, you still would get the

8  $75,000, if we continued to convert the shares.  Isn't that

9  true?

10 A.  If we continue to convert, we convert and sell out what we

11 can get as per the agreement.  Nothing changes.

12 Q.  Right.  So, you could do it either today or you could do it

13 a month from now or you could do it three months from now?

14 A.  I can't convert it until you have the shares.

15 Q.  Right.  So there is a process for the company to issue more

16 shares, and it is not overnight like you stated, correct?

17 A.  It is not overnight.  But it is definitely, it is a

18 moveable quicker way to go.

19        THE COURT:  Just let me ask a question, Mr. Funes.  In

20 your view, what is the problem with that scenario of waiting to

21 do it a month from now or three months from now?

22        THE WITNESS:  So, just to understand what he's saying,

23 the company has to go through a shareholder meeting to increase

24 the authorization.  That can take a couple months.  We have to

25 start the process.  You don't start the process, it will never

FC33ADAH                   Goldstein – cross

1   happen.  We feel it is a quicker way for them to go.  I have no

2   issue with that.  They haven't made any attempt to go and the

3   stock is very volatile.  The longer they schlep, the more we

4   are exposed to tremendous risk.  It is a risky business as is.

5   It is very risky.  The stock, it is a sub-penny stock, so there

6   is not that much room to the twilight zone.

7               THE COURT:  Mr. Funes.

8               MR. FUNES:  Yes, your Honor.  Thank you.

9   Q.  So you're talking about investment risk, right,

10  Mr. Goldstein?

11  A.  I'm sorry?

12  Q.  You're talking about an investment risk, correct?

13  A.  In terms of waiting longer in terms -- I don't have an

14  issue waiting for them, and we're here to encourage the company

15  to increase their authorized.

16  Q.  It is an investment risk for you, right?

17  A.  It increases the investment risk, that's correct.

18  Q.  Right.  But you are asking the Court to provide immediate

19  remedy because you are exposed to imminent harm and immediate

20  harm.  But if you can wait one or two or three months, then

21  we're not talking about immediate harm.  Are we?

22  A.  I just want to tell you, we do things very straight.  We

23  keep agreements.  We were totally played around with over here

24  for no reason.  If you're offering, if the company would ever

25  offer to increase the authorized instead of being so

FC33ADA2                    Goldstein - redirect

```
1    adversarial, we wouldn't be here now wasting so much people's
2    time and money.  It is totally one sided this whole situation.
3              THE COURT:  Mr. Funes, can I go off the record for one
4    minute.
5              (Discussion off the record)
6              (Recess)
7              THE COURT:  Mr. Funes, are you on the line?
8              MR. FUNES:  Hi, yes.
9              THE COURT:  I understand you're unable to resolve your
10   dispute?
11             MR. MURPHY:  That's correct.
12             THE COURT:  Why don't we put Mr. Goldstein back on the
13   stand.  Please remember you're still under oath.
14             THE WITNESS:  Sure.
15             THE COURT:  Speak into the mike.
16             Mr. Funes, do you have other questions for
17   Mr. Goldstein?
18             MR. FUNES:  Your Honor, I believe we've covered pretty
19   much everything, so at this point I have no other questions.
20             THE COURT:  Do you have any redirect questions?
21             MR. MURPHY:  I do, a few, your Honor.
22   REDIRECT EXAMINATION
23   BY MR. MURPHY:
24   Q.  Mr. Goldstein, Mr. Funes noted that Adar Bays had the
25   option to wait if Puge was interested in authorizing more
```

FC33ADA2                          Goldstein - redirect

1   shares.  Do you remember that question?

2   A.  Okay.

3   Q.  Has Adar Bays asked for the issuance of more shares by

4   Puge?

5   A.  Certainly.  We requested the shares, and I mean, under the

6   contract, he is supposed to either deliver or take methods to

7   cure it, which is increasing the authorized is one of the

8   methods.  That's all we asked him to do, just live up to the

9   contract.  It's not that hard.

10  Q.  How long ago was that?

11  A.  We submitted the conversion -- can I look at the exhibit?

12  Q.  Of course.  If it would refresh your memory.

13  A.  Yeah, it certainly would.

14          October 14.

15  Q.  That's never been honored, right?

16  A.  Nope.  Nothing's been done as far as to honor it either.

17  Q.  How long has Adar Bays been waiting?

18  A.  Since two, three days after that.  So about two business

19  days after October 14.  October 17, something like that.

20  Q.  Have you heard anything about Puge authorizing additional

21  shares?

22  A.  Didn't hear anything.  The only thing we got was a very,

23  very not nice thing from them.  They filed very not nice stuff

24  about us online.

25  Q.  You are referring to the civil threat letter?

FC33ADA2                        Goldstein - redirect

1   A.  Yes.

2   Q.  Is there continued risk for Adar Bays from waiting after

3   these conversion notes are not honored?

4   A.  Yes.  The company accrues expenses every single day, week,

5   month, and including filing if they are not able to raise the

6   money, they're, we risk, we just our risk grows literally every

7   single day unless something is taken to be cured.  Then he is

8   more likely to find other investors as well.  If he doesn't,

9   the stock could just fade away and we'll be totally goofed.

10  Q.  So, Mr. Funes also asked you about Direct Transfer.  Who is

11  Direct Transfer?

12  A.  I believe that's their transfer agent which issues the

13  shares for them.  They are the ones who would have the reserve.

14  They hold the reserve.

15  Q.  They act on instructions from whom?

16  A.  The reserve is in the agreement, and they're supposed --

17  the company is supposed to increase the reserve as needed.  The

18  company is supposed to tell them to either increase it.  If

19  they can't, to try to get the shares in different ways like I

20  mentioned before.  I can repeat it.  The way I mentioned it

21  before.  Either reserves get canceled or they get shares

22  canceled to reissue to us.  Or they take steps to reauthorize.

23  That's all I am asking them to do.

24  Q.  Why is it you are asking the Court to act now?

25  A.  Because the company may not be around in a few months.

FC33ADA2

1    They're very, very not easy people.  And therefore if the word

2    gets out on that, they're not going to be able to raise money.

3    We'll lose our money here.

4              MR. MURPHY:  No further questions, your Honor.

5              THE COURT:  All right.  Anything else, Mr. Funes?

6              MR. FUNES:  No.  That's all we have, Judge.

7              THE COURT:  All right.  You can step down,

8    Mr. Goldstein.

9              (Witness excused)

10             THE COURT:  I have a few questions and then I'm happy

11   to hear any final remarks.

12             One, Mr. Funes, has the company's finances, have they

13   improved at all?

14             MR. FUNES:  Your Honor, the finances are expected to

15   improve.  The company is expected to increase revenues.

16   Whatever they reported in the past, I believe the plaintiff is

17   referring to their most recent reports.  The company just moved

18   from Colorado to Florida.  So there has been a significant

19   period in which the CEO was removed and we have a new CEO.  The

20   company again has communicated to the plaintiff that he will

21   honor the contract in how it's offered to save the balance.

22   The defendant, the defendant had offered to pay his balance.

23   We are running with whatever funds were borrowed to us.  The

24   company is very well aware of its obligations and we want to

25   bring the balance current.  The company is working in different

FC33ADA2

1    technologies right now in order to raise revenue, but because

2    the company -- the corporation changes we were not able to meet

3    the current obligations.

4            Now, what the plaintiff is asking your Honor to issue

5    the shares, it's almost -- virtually, it is not impossible but

6    it's very hard.  And even if the company were to do that, it

7    would require a shareholder meeting.  So even if your Honor

8    were to grant this injunction, that the shareholder meeting

9    could result in the shareholders not agreeing to issue shares.

10   So the defendant would be in automatic contempt of your Honor's

11   order.  And which is why it doesn't make any sense.

12           So we want to make it right for the plaintiff and pay

13   the money back but they will have to wait.  And we have made

14   reasonable efforts to render payment.  But the defendant is

15   asking for money now, and is asking us to do corporate changes

16   that cannot be done overnight.

17           So even if your Honor issues his order, it would be --

18   the order would almost be non-enforceable and it would put us

19   in automatic contempt.  So we would be again in front of your

20   Honor weeks or even days from now because the plaintiff will

21   file for a motion for contempt because we don't issue the

22   shares and, obviously, that's unenforceable, Judge.

23           So we want to find -- the defendant will honor the

24   payment but we need additional time.  This is not something

25   that is subject to a restraining order or a motion for

FC33ADA2

1    injunction.

2                THE COURT:  Would plaintiff's counsel like to be

3    heard.

4                MR. MURPHY:  Yes.  I think the most important element

5    that Mr. Funes said is that if your Honor issues an order to

6    increase the reserves, it would be unenforceable.  There is no

7    evidence of that.  In fact, the agreement covers that very

8    possibility.  If your Honor looks to Exhibit A of the Goldstein

9    declaration, within Section 12, the company has to issue

10   irrevocable transfer agent instructions upon the execution.

11   Full six million shares of common stock are to be made

12   available for conversions.  And the last sentence, the holder

13   of this note, that is Adar, may reasonably request increases

14   from time to time to reserve such amounts, and those amounts

15   are the amount of the minimum of four times the amount of

16   shares required if the note will be fully converted.

17               There is an ongoing obligation that they've already

18   signed on to.  It is fully enforceable, your Honor.

19               THE COURT:  As a practical matter, what is going to

20   happen?  It seems like they didn't keep the reserves that they

21   were required to keep, right?  So what is going to happen as a

22   practical matter?

23               MR. MURPHY:  As a practical matter, upon your Honor's

24   order, they would risk -- they would subject themselves to

25   contempt if they didn't immediately respond by having a

FC33ADA2

1    shareholders meeting.  And at the shareholders meeting they

2    would authorize the issuance of additional stock.  They would

3    fulfill the required minimum reserve of four times to convert

4    the full amount of the note and they would honor the -- the

5    pending conversion request by Adar, and then Adar would be in a

6    position to send additional conversion requests as needed to

7    pay down the note.

8             THE COURT:  Mr. Funes, why are you not obligated to do

9    that?

10            MR. FUNES:  To call for a special meeting for

11   shareholders, your Honor?  Is that what you're asking?

12            THE COURT:  Yes.  To respond as required by the

13   contract.

14            MR. FUNES:  We can call for a special meeting.  But

15   what if the outcome of the meeting is that the shareholders do

16   not agree to issue additional shares?  Because the shareholders

17   are not bound by this agreement.  Even if they understand the

18   nature of the agreement, if it's financially not feasible for

19   the corporation to issue shares at the time, then no

20   shareholder may vote for this resolution.

21            THE COURT:  I assume the shareholders will be advised

22   of the company's obligations under the contract, right?

23            MR. FUNES:  Sure.  We could do that.  But again, the

24   outcome is not guaranteed.  And issuing that restraining order

25   or temporary injunction for us to comply with something that we

FC33ADA2

1    don't know the outcome of this, it would be highly prejudicial

2    for the defendant, not to mention that Puget is incorporated in

3    Nevada so we're subject not only to state regulation in regard

4    to this new issuance of shares.  Again, the contract has not

5    contemplated that specific issue.

6            But, we would make reasonable efforts, your Honor, if

7    it is necessary, to have a shareholders meeting to exercise an

8    election to vote for additional shares.  But again, this is not

9    something that will be definitely -- is not a definite

10   guarantee that it will result in a positive outcome that the

11   plaintiff is waiting for, which is additional issuance of

12   shares.

13           THE COURT:  I assume the shareholders will be informed

14   of the consequences of failing to comply with the court order.

15   Am I right?

16           MR. FUNES:  Yes, your Honor.  I don't believe any

17   shareholder would like to be in -- any shareholder would like

18   to have their company that they have invested in be in

19   violation, but again, it is a voluntary vote.  Having the

20   shareholders vote for something, it is almost forcing them to

21   vote for the specific election where some voters have the

22   option to vote no and others want --

23           THE COURT:  Frankly, it seem likes what you are saying

24   is it is just not convenient at this point in time for your

25   client to comply with this agreement.

FC33ADA2

1        MR. FUNES:  Not the way -- it is not that it's not

2   convenient, your Honor.  We just can't.  I mean, we would like

3   to have the option to comply.  But we need additional time.

4   Right now, yes, your Honor, I would agree it is not convenient,

5   as of right now.  But to immediately comply with the clauses of

6   the contract is virtually impossible to comply today for

7   example.  We would need additional time.

8        THE COURT:  So Mr. Murphy, I'm happy to hear you out

9   otherwise.  I just have a few questions.  So first on the

10  timing, if in fact Puge has to go back and take steps to

11  authorize more shares, what is going to happen in terms of the

12  timing, the time in between?

13       MR. MURPHY:  In our view what will happen is there

14  will be continued volatility.  So for example, there was

15  volatility on Monday when we first met, and there is volatility

16  still today.  And there is risk.  For every day of risk, it's a

17  problem for Adar.  But, Adar would like, as Mr. Goldstein

18  pointed out in his testimony, the ball to get rolling in some

19  way.  The initial request for the share to be increased was on

20  September 9.  We're almost two months from that.

21       THE COURT:  My question is more a practical one.  If I

22  am to rule in your favor, which I am inclined to do, is there

23  timing that I should put into the order?  So, what defense

24  counsel is saying is, look, we can't do this today, it just

25  won't happen.  So it won't be productive to have a contempt

FC33ADA2

1    motion tomorrow.  So I'm asking if any kind of timing deadline

2    should be put in an order.

3             MR. MURPHY:  I'd like to confer with Mr. Steinmetz on

4    this issue.

5             THE COURT:  Yes.

6             (Pause)

7             MR. MURPHY:  Your Honor, what we can do with respect

8    to the timing issue, is we'll have to check with the SEC

9    guidelines, there are some guidelines on I believe the first

10   time a meeting can be held for the shareholders on a reasonable

11   notice.  So we can draft an order that will include those

12   timing elements.

13            THE COURT:  Okay.  I am going to have you do that.  I

14   also wanted to ask a specific question about the number of

15   shares.  In Mr. Goldstein's declaration and notice of

16   conversion you indicate that Adar is entitled to 4,197,901

17   shares.  But in the memorandum and proposed order that number

18   is 4,197,580.  So I want to clarify which number is right and

19   what it is based on.

20            MR. MURPHY:  Of course.

21            THE COURT:  Sure.

22            MR. MURPHY:  So, the correct number, your Honor, is in

23   Exhibit J and it is the 4,197,901 number.

24            THE COURT:  All right.

25            MR. MURPHY:  We'll include that also in the proposed

FC33ADA2

1    order.

2              THE COURT:  Two more questions.  One was that

3    defendants' concern that Adar may act in violation of SEC Rule

4    144(e)(3)(vi).  Would your client be willing to include have

5    some reference to the fact that in the opinion that it

6    furnishes to Puge that Adar will comply with the requirements

7    of the SEC rule?

8              MR. MURPHY:  Of course, your Honor.

9              THE COURT:  So why don't we include that as well in

10   the proposed order.

11             Finally, with respect to the bond, I do think a bond

12   is appropriate here.  But I think what may be best is to place

13   the proceeds of the sale of any converted stock, that amount,

14   into an escrow account.  That's what Judge Schwartz did in

15   *Netwolves*, which I think is appropriate here in terms of the

16   volatility of the stock.  Would that be feasible to figure out

17   what the worth of the stock is and put that amount in escrow.

18             MR. MURPHY:  I don't believe there will be any issue

19   with that, your Honor.

20             THE COURT:  All right.

21             MR. MURPHY:  I can't imagine that there would be.  So

22   our concern is that the dates may be difficult, we have to peg

23   it to a particular date.

24             THE COURT:  Right.  Right.  So do you want to talk

25   about that for a minute, think that out, and let me know.

FC33ADA2

1          MR. MURPHY:  Sure.

2          (Pause)

3          MR. FUNES:  I think we have to -- are you asking

4     everyone, Judge?

5          THE COURT:  I'm happy to hear you out on that, Mr.

6     Funes.

7          MR. FUNES:  In terms of timing when to call the -- are

8     you talking about the bond or are you talking about when to

9     call the special meeting?

10          THE COURT:  We already talked about the separate

11     meeting, and plaintiff's counsel indicated that it was going to

12     review the SEC rules and submit a proposed order with a date

13     that gives sufficient time to set up a shareholders meeting.

14     With respect to the bond I'm waiting to hear plaintiff's

15     response.

16          MR. FUNES:  Now, your Honor, it is the plaintiff is

17     required to put this bond for us?

18          THE COURT:  Correct.

19          MR. FUNES:  Okay.  Also, your Honor, I need

20     clarification as to the shareholders meeting.  What is the

21     outcome result in the shareholders voting for no more shares to

22     be issued or shares that are under 4 million?

23          THE COURT:  I'm sorry.  Are you just asking what

24     happens if the company refuses to comply with a court order?

25     Is that what you're asking?

FC33ADA2

 1          MR. FUNES:  Yes, your Honor.  Again, that it is a

 2   shareholders meeting, and so basically you're imposing all

 3   shareholders who are individuals to vote for a resolution where

 4   actually, you know, it is an election.  So they should be

 5   shareholders are free to vote either yes or no to a resolution.

 6          THE COURT:  Do you want to respond?

 7          MR. STEINMETZ:  Your Honor, I think the company would

 8   be held in contempt, not individual shareholders.

 9          THE COURT:  That's exactly right.  Did you hear that,

10   Mr. Funes?

11          MR. FUNES:  Yes, your Honor.

12          THE COURT:  It is the company that would be held in

13   contempt.  It is the company that's a defendant.  It is the

14   company that's a signatory to the agreement.  And it is

15   obligated to comply with the agreement that it entered into.

16          MR. FUNES:  I understand that, your Honor.

17          THE COURT:  Did you want to respond, did you want to

18   make any additional comments about the bond or otherwise?

19          MR. STEINMETZ:  I did, your Honor.  Perhaps what we

20   can do with the bond, since it is difficult to peg a particular

21   price at which plaintiff may be able to sell these, to keep

22   profits, what we can do is as an ongoing -- and I need to talk

23   to the client as to feasibility but this might be possible.

24   There is a $7,000 pending conversion.  Profits earned beyond

25   $7,000 could be kept in escrow.  If the stock goes down and no

FC33ADA2

 1  money is made, the client wouldn't be out.  If the client did

 2  make money, those funds would be kept in escrow so the client

 3  wouldn't benefit.  They just wouldn't lose.  They would

 4  maintain the status quo.

 5           THE COURT:  Let me just take a break for a minute or

 6  two.  Let me finalize my ruling and I'll come out and read the

 7  ruling into the record.

 8           MR. MURPHY:  Thank you, your Honor.

 9           MR. FUNES:  Very well, your Honor.

10           (Recess)

11           THE COURT:  Mr. Funes, you still on the line?

12           MR. FUNES:  Hello.

13           THE COURT:  Hi.  This is Judge Abrams.  I'm ready to

14  rule.  Can you hear me?

15           MR. FUNES:  Yes, your Honor.  Just one qualification.

16  I would like to know if this is a partial ruling, because I'm

17  not clear whether the plaintiff has met the standard which

18  refers to immediate or irreparable harm.  Because even if the

19  order says that he is, then that would be contrary to what

20  he -- what Mr. Goldstein said, that an issuance of shares a

21  shareholder meeting could take weeks, if not months, and also

22  the plaintiff is supposed to check the SEC regulations.  I want

23  to make sure that whether it is a partial ruling because your,

24  Honor, I believe that at least the immediate or irreparable

25  harm element has not been met.

FC33ADA2

1          THE COURT:  I disagree with you.  I'm going to state

2     my ruling.  You can get the transcript from the court reporter

3     and review it.  And as I already started to discuss, I am going

4     to have plaintiffs submit a proposed order consistent with this

5     ruling and the issues that I raised earlier.

6          As a preliminary matter, jurisdiction is proper in

7     this court.  The Court has subject matter jurisdiction pursuant

8     to 28 U.S.C. Section 1331, and by the terms of their securities

9     purchase agreement, the parties have waived any objections to

10    jurisdiction and venue and agreed not to assert any defense

11    based on forum non conveniens.

12         Adar Bays is seeking a preliminary injunction against

13    Puge Technologies which would (1) require Puge to deliver

14    4,197,901 shares of common stock to Adar, along with the

15    necessary corporate resolutions; (2) require Puge to accept the

16    contractually required legal opinions furnished to it by Adar

17    to enable Adar to sell its Puge common stock publicly without

18    restriction; and (3) require Puge and its agents to honor

19    during the pendency of this action and in accordance with the

20    law, and the agreement between the parties, all future

21    conversion requests Adar duly submits, and to deliver all

22    necessary corporate resolutions and legal opinions to enable

23    Adar to sell Puge common stock publicly without restriction.

24         For the reasons that I will state I'm granting

25    plaintiff's request for a preliminary injunction.  As I stated,

FC33ADA2

```
 1    the particular language in the order still needs to be

 2    determined.

 3              The preliminary injunction standard is familiar.  A

 4    preliminary injunction is merited only where the moving party

 5    can show irreparable harm absent an injunction, and either a

 6    likelihood of success on the merits or sufficiently serious

 7    questions going to the merits to make them a fair ground for

 8    litigation, and a balance of hardships decidedly tipping in the

 9    moving party's favor.

10              When seeking a mandatory injunction that would alter

11    status quo by demanding that the Court order affirmative

12    action, as Adar is here, the movant must make a clear or

13    substantial showing that he or she is entitled to the relief

14    requested.  See the Second Circuit's decision in *Tim Doherty*

15    *Associates*, 50 F.3d at 34.  If issued, the injunction here

16    would compel Puge to convert $7,000 of the outstanding

17    principal on the note for nearly 4.2 million shares of Puge

18    common stock.

19              Defendants have met this standard with respect to

20    success on merits.  Section 4(a) of the note entitles Adar at

21    its option at any time to convert all or any amount of the

22    principal face amount of the note then outstanding into shares

23    of Puge's common stock.  That's from the Goldstein declaration

24    Exhibit A at two.  Puge is obligated to effect such a

25    conversion within three days of being served notice of
```

FC33ADA2

1    conversion.  Section 11 of the note also requires Puge to

2    instruct its counsel to either (1) write a 144 opinion to allow

3    for saleability of the conversion shares or (2) accept such

4    opinion from Adar's counsel.  *Id.* at 6.

5         On October 15, 2015, Adar executed and delivered a

6    notice of conversion to Puge in which it elected to convert

7    $7,000 of the note's outstanding principal for nearly 4.2

8    million shares of Puge's common stock.  Goldstein declaration

9    Exhibit G.  Despite honoring three of Adar's previous requests

10   for conversion, Puge failed to turn over the common stock

11   within three days of the notice, and has not remedied the

12   failure.

13        Defendants argue that plaintiff has not shown that it

14   will succeed on the merits for two reasons.  First, Puge argues

15   that because the parties have conflicting interpretations of

16   the agreement, Adar has not met its burden of showing it is

17   likely to succeed on the merits.  Specifically, Puge claims

18   that it does not have a sufficient number of authorized shares

19   to issue the 4.2 million shares to Adar, and that this

20   situation was not contemplated by their agreement.

21        I find that the terms of the agreement are not

22   ambiguous.  Section 12 of the note provides Puge should at all

23   times reserve a minimum of four times the amount of shares

24   required if the note would be fully converted.  Goldstein

25   declaration Exhibit A at 6.

FC33ADA2

1          By the terms of the note, Puge assumed the

2    responsibility to ensure that there was a sufficient number of

3    shares to allow Adar to convert the outstanding balance of the

4    note.  Puge's apparent inability to comply with this term of

5    the contract does not render the agreement ambiguous.  In

6    short, Puge's failure to comply with one provision of the note

7    keeping a sufficient number of shares in reserve does not

8    excuse its performance under no provision of the note -- its

9    obligation to honor Adar's conversion request.  See Judge

10   Lynch's opinion in *Castle Creek Technology Partners*, 2002 WL

11   31958696 at *7.

12         Second, Puge argues that issuing the shares to Adar

13   would violate SEC Rule 144 which places certain limitations on

14   the sale of restricted securities.  17 C.F.R. 230.144(a)(3)(i).

15   Specifically, Puge alleges Adar will violate Rule 144(e)(3)(vi)

16   if permitted to obtain the 4.2 million shares.  The rule

17   provides that when two or more parties act in concert for the

18   purpose of selling securities of an issuer, all securities of

19   the same class sold during any three-month period shall be

20   aggregated for the purpose of determining applicable volume

21   limitations.  This rule is not a valid defense to this

22   injunction.  It does not interfere with Adar's right to convert

23   outstanding debt for common stock, but simply limits the amount

24   of stock Adar may sell within a three-month period.  See the

25   Netwolves case, 2001 WL 492463 at *11.

FC33ADA2

1      In light of Adar's conversion right and the evidence

2   that Puge was served with a duly executed conversion notice, I

3   find that Adar has made a substantial showing that it is

4   entitled to Puge's common stock, and that Puge is required to

5   accept an opinion from Adar's counsel to allow for the sale of

6   the conversion shares, and that the opinion shall indicate that

7   Adar will comply with Rule 144(e)(3)(vi).

8      Adar has also shown that they may suffer irreparable

9   harm if the injunction is not granted.  To show irreparable

10  harm, a plaintiff must show an injury is actual, imminent, and

11  cannot be remedied by an award of monetary damages.  While

12  purely financial injury is generally not enough to warrant

13  injunctive relief, the Second Circuit has held that a

14  defendant's imminent insolvency can constitute irreparable

15  harm.  See the *Brenntag International Chemicals* case, 175 F.3d

16  at 249-50.  Courts in this district have accordingly provided

17  parties with injunctive relief where the moving party offers

18  evidence that the defendant may not be able to pay damages at

19  the conclusion of the litigation.  See the *Alpha Capital*

20  *Anstalt* case, docket number 11 CV 6458.

21      Adar has presented considerable evidence that Puge is

22  on the brink of insolvency.  Puge disclosed in its

23  September 23, 2015, quarterly report, form 10-QA, that the

24  company has incurred losses since inception resulting in an

25  accumulated deficit of $1,505,530 as of July 31, 2015, and

FC33ADA2

1   further losses are anticipated in the development of its

2   business, raising substantial doubt about the company's ability

3   to continue as a going concern.  See the Goldstein declaration

4   Exhibit J at page 7.

5          Puge's balance sheet further evidences its precarious

6   financial position.  Puge's liabilities amount to over three

7   times that of its current assets.  Puge has $327,119 in assets

8   and approximately $1.2 million in liabilities.  *Id.* at 4.  And

9   Puge's cash flow suggests that there is little prospect for

10  improvement.  Puge reported an operating loss of $725,503 for

11  the nine months ending July 31, 2015.  *Id.* at 5.  Although the

12  company's filings allude to plans to raise capital and take on

13  additional debt, no concrete proposal was outlined.  With only

14  $15,484 cash on hand, the company stated that their cash

15  balance along with anticipated revenue from sales may not be

16  sufficient to cover expenses it will incur during the next 12

17  months.  Goldstein declaration Exhibit J at 16.

18         Nothing, I should add, that Mr. Funes argued today was

19  anything beyond mere speculation.

20         In sum, Adar has adduced ample and specific evidence

21  that Puge is on the cusp of insolvency and would likely be

22  unable to pay damages at the conclusion of litigation.  See

23  *Castle Creek Technology Partners* 2002 WL 31958696 at *4.

24         Defendants argue that plaintiff is not entitled to

25  equitable relief because it acted with unclean hands.  Puge

FC33ADA2

argue that the terms of the contract are unconscionable and

tainted by deception, fraud and misrepresentations.  To

successfully assert the equitable defense of unclean hands,

defendant must establish that the plaintiff acted in bad faith

and the defendants were injured by the conduct.  Defendants

have not carried their burden here.  Beyond blanket

allegations, Puge points to only one specific act which it

alleges is fraudulent.  Adar included in the securities

purchase agreement a funding lock up clause which barred Puge

from entering another loan for 30 days.  Puge alleges that Adar

somehow forced Puge to violate this provision by colluding with

another lender, causing Puge to enter another contract on the

same day as entered the agreement with Adar.  Because the

second agreement contained the same lock up provision, Puge was

immediately in default of both agreements.  Yet, Puge does not

make clear exactly how Adar forced it to agree to both

contracts.  Moreover, Puge does not allege that Adar sought to

recover based on this breach, and this breach is not the basis

of the current motion.

        Beyond this one instance, Puge makes only conclusory

allegations that violated numerous state and federal securities

laws without any sworn affidavit to support its factual claims.

With only bare allegations, the Court is unable to find that

Adar acted in bad faith.

        Accordingly, the motion for preliminary injunction is

FC33ADA2

```
 1    granted.  As discussed, the defendants will have to deliver to

 2    plaintiff 4,197,901 shares of common stock in accordance with

 3    the 8 percent convertible redeemable note, and to accept legal

 4    opinions to allow for the stock sale.  The legal opinions shall

 5    specify that any sale of Puge stock will be in accordance with

 6    SEC Rule 144(e)(3)(vi).

 7            In complying with the order, defendant will make all

 8    reasonable efforts to increase the number of authorized shares,

 9    and the plaintiff shall submit a proposed order specifying the

10    amount of time appropriate to do so.  Defendants are also

11    ordered to honor plaintiff's future requests for conversion

12    insofar as they are in accordance with the note.

13            Plaintiff argues that a bond is not necessary here.

14    Rule 65(c) of the Federal Rules of Civil Procedure provides

15    that the Court may issue a preliminary injunction only if the

16    movant gives security in an amount that the Court considers

17    proper to pay the costs and damages sustained by any party

18    found to have been wrongfully enjoined or restrained.

19            While the rule reads as mandatory, as plaintiff points

20    out, it is within the District Court's discretion not to

21    require a bond where there is no risk that defendant will incur

22    damages.  See the Second Circuit's decision in *Maryland*

23    *Casualty Company*, 107 F.3d at 985.

24            Here, there are allegations of fraud, however

25    undeveloped, which relate to the note at issue.  Therefore, I
```

FC33ADA2

```
 1   cannot conclude there is no risk that the defendants will incur
 2   damages while the injunction is in place.  Accordingly,
 3   plaintiff is ordered to deposit into an escrow account of their
 4   legal counsel the profits of any sale of the Puge stock
 5   obtained from the $7,000 conversion and future conversions for
 6   the payment of such costs and damages as may be incurred by
 7   defendants if a court later finds that defendants have been
 8   wrongfully enjoined.  Such proceeds will remain in escrow until
 9   an application to release them, and the Court so orders their
10   release.
11           So how long do you think it will take you to submit a
12   proposed order, Mr. Murphy?
13           MR. MURPHY:  I think tomorrow, your Honor.
14           THE COURT:  All right.  So I'll look at that tomorrow
15   and hopefully we can get that out.  And still I'd urge you to
16   the extent possible to try to work together to resolve this.
17           MR. MURPHY:  If Mr. Funes is available tomorrow, we'll
18   call him again.
19           MR. FUNES:  Yes.  That sounds good, your Honor.
20           THE COURT:  Okay.  Thank you.  We are adjourned.  And
21   you should get the transcript from the court reporter.
22           MR. MURPHY:  Of course, your Honor.
23           THE COURT:  Thanks.  Have a nice evening.
24
25
```

```
1                      INDEX OF EXAMINATION

2   Examination of:                            Page

3   ARYEH GOLDSTEIN

4   Direct By Mr. Murphy . . . . . . . . . . . . . 5

5   Cross By Mr. Funes . . . . . . . . . . . . . .12

6   Redirect By Mr. Murphy . . . . . . . . . . . .20

7                      PLAINTIFF EXHIBITS

8   Exhibit No.                              Received

9    A   . . . . . . . . . . . . . . . . . . . . 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```