**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ADAR BAYS, LLC

                              Plaintiff,

               v.                                    Civil Action No.: 15-CV-8860 (RA)

PUGET TECHNOLOGIES, INC. and                **SECOND AMENDED COMPLAINT**
HERMANN C. BURCKHARDT

                              Defendant.

---

Plaintiff, ADAR BAYS, LLC, by and through its undersigned attorneys, for their complaint, respectfully allege as follows:

## COMPLAINT AND JURY DEMAND

1.      This is an action regarding the precipitous corporate meltdown of a publicly traded corporation at the hands of its control person and the resulting federal securities law violations, and supplemental New York State law claims for breach of contract, tortious interference, fraudulent conveyance and defamation, flowing therefrom.

2.      After entering into negotiated, arms-length agreements, for which defendants received valuable consideration, and subsequent to defendants' repeated acknowledgment of the validity thereof, defendants attempted to renegotiate the terms of such agreements and threatened to breach the agreements if plaintiff did not agree.  Upon plaintiff's refusal to renegotiate, defendants opted to retaliate by disseminating a letter falsely accusing plaintiff of "civil theft" and threatening plaintiff with "prosecution".  Thereafter, defendants compounded this misconduct by including a copy of said letter in its public 8-K filings with the SEC and further, disseminated the letter to several individuals within the securities industry in an

effort to interfere with plaintiff's commercial relationships and cause harm to plaintiff's reputation in the community.

3.      Moreover, in an effort to frustrate plaintiff's ability to collect upon its debt, defendants fraudulently conveyed company assets at the expense of its creditors.

4.      By virtue of the foregoing, plaintiff respectfully seeks relief in the manner set forth below.

## PARTIES

5.      Plaintiff ADAR BAYS, LLC ("ADAR") is a limited liability company duly organized under the laws of the State of Florida having a principal place of business located at 3411 Indian Creek Drive, Ste. 403, Miami Beach, FL 33140.

6.      Upon information and belief, Defendant PUGET TECHNOLOGIES, INC. ("PUGE") is a corporation organized and existing under the laws of the State of Nevada having its principal place of business located at 801 Brickell Avenue, Suite 900, Miami, Florida 33131.  PUGET TECHNOLOGIES, INC. is traded publicly under the symbol "PUGE."

7.      Upon information and belief, Defendant HERMANN C. BURCKHARDT ("Burckhardt") is an individual residing at 9796 NW 51st Terrace, Miami, Florida 33178.  Burckhardt serves as PUGE President and CEO, and is one of only two directors, officers, and/or employees of PUGE.  According to PUGE's Form 8-K, filed with the SEC on October 1, 2015, Burckhardt signed a 5-year contract with PUGE. The compensation for Burckhardt's position with PUGE has granted him a 10% interest stake in the company in addition to salary of $8,000 per month for six months, which escalates over the life of the contract to a maximum of $15,000 for the last 3 years of the contract.

## JURISDICTION AND VENUE

8.      This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), as well as various related state law claims.

9.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa and 28 U.S.C. § 1331.

10.     This Court has supplemental jurisdiction of Plaintiff's various state law claims pursuant to 28 U.S.C. § 1367(a).

11.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), in that it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property which is subject of this action is situated; and New York judicial districts are the exclusive venue where the parties agreed that the claims hereafter set forth can be brought.  Venue is also proper under 28 U.S.C. § 1401 as PUGE could have brought suit against Burckhardt in this judicial district.   Additionally, in the relevant agreements, defendants consented to jurisdiction and proper venue in the Southern District of New York.

## FACTUAL BACKGROUND

### The Note

12.     On or about January 30, 2015, after arm's-length negotiations, PUGE duly issued a $75,000 8% Convertible Redeemable Promissory Notes to ADAR  (the "Note").  A true and correct copy of the Note is attached hereto as Exhibit A.  The claims herein arise from PUGE's willful breaches of its obligations pursuant to the terms of the Note and the fraudulent conduct engaged in by PUGE subsequent to said breaches.

13.     The Note provides that ADAR, at any time after execution, has the right to convert all or part of the Note into shares of PUGE common stock (the "Common Stock").  Specifically, §4(a) of the Note provides in pertinent part:

> The Holder of this Note is entitled, at its option, at any time, to convert all or any amount of the principal face amount of this Note then outstanding into shares of the Company's common stock (the "Common Stock")…

Ex. A at 2, § 4(a).

14.     The mechanics of converting the Note required ADAR to submit a Notice of Conversion to PUGE.  Accordingly, §3 of the Note provides, in pertinent part:

> Any Holder of this Note electing to exercise the right of conversion set forth in Section 4(a) hereof, in addition to the requirements set forth in Section 4(a), and any prospective transferee of this Note, also is required to give the Company written confirmation that this Note is being converted ("Notice of Conversion") in the form annexed hereto as Exhibit A.

Ex. A at §3.

15.     As §4(a) of the Note dictates, the price at which the Note was convertible (the "Conversion Price") was to be determined "for each share of Common Stock to be equal to 57.5% of the **average of the three lowest closing bid prices** of the Common Stock as reported on the National Quotations Bureau OTCQB exchange which the Company's shares are traded . . . for the ***fifteen*** prior trading days including the day upon which a Notice of Conversion is received by the Company…" (Emphasis in original).

16.     Further, under §4(a), Notices of Conversion are to be "effectuated by the Company [PUGE] delivering the shares of Common Stock to the Holder within 3 business of receipt by the Company of the Notice of Conversion."

4

17.     In order to ensure that sufficient shares are available for conversion, §12 of the Note provides that "[t]he Company shall issue irrevocable transfer agent instructions reserving 6,000,000 shares of its Common Stock for conversion under this Note (the "Share Reserve")."  Further, the Note requires that, "[t]he Company should at all times reserve a minimum of four times the amount of shares required if the Note would be fully converted.  The Holder [ADAR] may reasonably request increases from time to time to reserve such amounts."

18.     Concurrently with the Note, PUGE issued a letter to its transfer agent ("TA"), Direct Transfer, LLC ("Direct Transfer"), noting that Direct Transfer was, and is:

> Irrevocably authorized and instructed to reserve a sufficient number of shares of common stock ("Common Stock") of the Company (initially, 6,000,000 shares for the Note) for issuance upon full conversion of the Note in accordance with the terms thereof (the "Reserved Shares").  The Holder shall have the right to periodically request that the number of Reserved Shares be increased so that the number of Reserved Shares at least equals 400% of the number of shares of the Company common stock issuable upon conversion of the Note.

> The ability to convert the Note in a timely manner is a material obligation of the Company pursuant to the Note.  Your firm is hereby irrevocably authorized and instructed to issue shares of Common Stock of the Company (without any restrictive legend) to the Holder without any further action or confirmation by the Company…

PUGE's Letter to Direct Transfer is attached as Exhibit B.

19.     The conversion feature of the Note is a material term.  ADAR was unwilling to lend money to PUGE simply to earn an interest rate return on a note. Investment in PUGE was and remains exceedingly risky. Therefore, ADAR was only willing to purchase the Note if it could earn a return commensurate with the risk. ADAR's ability to obtain stock at a discount to the market price and resell it on the open market provided ADAR with an opportunity to earn such a return.  Any failure

by PUGE to honor Conversion Notices, therefore, deprives ADAR of the essential benefit for which it negotiated, and for which it purchased, the Note.

## Numerous Conversions Honored Without Incident

20.     Following execution of the Note, PUGE, at least initially, acted in full compliance with the terms of the first Note, accepting the benefits of ADAR's investment and honoring several ADAR conversions of PUGE stock thereunder.

21.     After acquiring the Note, on or about August 3, 2015, ADAR duly submitted a Notice of Conversion to convert $5,000 of the balance of the Note into 261,131 shares of PUGE Common Stock, leaving a principal balance of $69,000.00, plus interest accruing thereupon, on the Note.  This conversion was honored and the requisite shares were delivered accordingly.  The August 3, 2015 Notice of Conversion is attached hereto as Exhibit C.

22.     On or about August 20, 2015 ADAR duly submitted a Notice of Conversion to convert $6,000 of the balance of the Note into 1,897,233 shares of PUGE Common Stock, leaving a principal balance of $63,000, plus interest accruing thereupon, on the Note.  This conversion was honored and the requisite shares were delivered accordingly.  The August 30, 2015 Notice of Conversion is attached hereto as Exhibit D.

23.     On or about September 8, 2015 ADAR duly submitted a Notice of Conversion to convert $10,000 of the balance of the Note into 3,840,580 shares of PUGE Common Stock, leaving a principal balance of $53,000, plus interest accruing thereupon, on the Note.  This conversion was honored and the requisite shares were delivered accordingly. The September 8, 2015 Notice of Conversion is attached hereto as Exhibit E.

**PUGET's Conduct Runs Afoul of the Terms of the Note**

24.     On or about September 9, 2015, and upon concluding its September 8, 2015 Conversion, ADAR, acting within the bounds of the Note's provisions, requested in writing that Direct Transfer increase the number of shares in reserve, stating in pertinent part:

> You had previously reserved shares for issuance under the Note pursuant to the terms of irrevocable instructions dated January 30, 2015 (the "TA Letter").  As a result of the stock price falling from the time Adar Bays, LLC entered into a financing agreement with the company, the current reserve at the transfer agent must be amended.  The TA letter provides that the reserve may be increased by written instructions of the Company and the Investor.  This letter is to serve as instruction to increase the reserve under the TA Letter by an additional 77,391,304 shares.  All other provisions of the TA Letter remain unchanged.

The September 9, 2015 TA Reserve Increase Letter is attached hereto as Exhibit F.

25.     No response to the September 9, 2015 TA Reserve Increase Letter was ever received. As of the date of filing, PUGE has failed to counter-sign this letter. In omitting to do so, PUGE has failed to fulfill its obligations under the Note.

26.     On or about September 16, 2015, PUGE sent a proposal letter ("Proposal") to its note holders, seeking to augment the terms of its securitized notes. PUGE's September 16, 2015 Proposal is attached hereto as Exhibit G.

27.     In addition to admonishing the performance of PUGE's former CEO, Larson Elmore, and touting *potential* new hires, the Proposal sought to require ADAR, and similarly-situated note holders, to: (i) cease converting any portion of any Note for a period of six (6) months; (ii) permit the respective notes to be paid down monthly at the same interest rate with a 5 year amortization schedule; (iii) permit PUGE, in PUGE's sole discretion, to increase the moratorium on conversion for an

7

additional three months should PUGE feel more time would be PUGE stock for a period of six months, if the respective note holder be deemed a "major shareholder," i.e., those owning 5% or more of the outstanding stock; amongst other requests. Exhibit G.

28.     ADAR declined this invitation to renegotiate the terms of the Note.

29.     On or about October 8, 2015, seeking to assist PUGE in remedying its failure to authorize the increase of the Share Reserve, ADAR dispatched an email to PUGE, stating therein: "[w]e have a balance of $53,400.00 on the convertible note with no shares left in reserve.  Please sign the attached [TA Reserve Increase Letter] so we can get the reserve in place with the TA.  Thanks."  The October 8, 2015 email is attached hereto as Exhibit H.

30.     On or about October 12, 2015, ADAR reminded PUGE of its continued failure to replenish its Share Reserve under the Note. The October 12, 2015 email is attached hereto as Exhibit I.

31.     On or about October 14, 2015, ADAR again duly submitted a Notice of Conversion to PUGE to convert another portion of the Note's principal and interest into shares of Common Stock.  Specifically, ADAR elected to convert $7,000 of the Note into 4,197,901 shares, based on a conversion price of .0016675.  The October 14, 2015 Notice of Conversion is attached hereto as Exhibit J.

32.     In connection with this Conversion Notice, and pursuant to the terms of the Note, ADAR provided Direct Transfer an opinion letter from counsel concerning Share Issuance under Rule 144.  The October 14, 2015 opinion letter is attached hereto as Exhibit K.

33.     Without legitimate excuse or justification, PUGE refused to deliver to ADAR the shares of Common Stock that it was obligated to deliver upon receiving such Conversion Notice.

## PUGE's Misrepresentations of Fact

34.     On or about October 16, 2015, having failed to respond to ADAR's October 14, 2015 Conversion Notice, and after AFAR declined to renegotiate the terms of the Note, new PUGE President and CEO, Hermann Burckhardt emailed ADAR a copy of a "Civil Theft Letter," accusing ADAR of engaging in a scheme to defraud and theft from PUGE.  PUGE's "Civil Theft Letter" is attached hereto as Exhibit L.  PUGE's allegations are patently false.

35.     The Civil Theft Letter alleges that ADAR contracted for loans that are "clearly fraudulent."  However, ADAR furnished money to PUGE under a negotiated, arms-length promissory note, duly executed by PUGE.

36.     Furthermore, in negotiating the Note, the parties were each represented by sophisticated counsel.

37.     The Civil Theft Letter further alleges that lenders "arranged a default on inception."  However, ADAR was in no position to do so as it had no control over PUGE at any time.

38.     Additionally, the Civil Theft Letter alleges that: "the lender was paid a huge commission."  Yet, the Civil Theft Letter neither specifies what commission, if any, was paid, nor does it articulate why this alleged commission was "huge."  In any event, no such commission was ever tendered.

39.     The Civil Theft Letter further alleges that: "ADAR is acting in concert with New Venture Attorneys, using questionable and identical attorney opinions from New Venture Attorneys." Upon information and belief, the Civil Theft Letter's reference to "New Venture Attorneys" refers to Tomer Tal, who has represented the lender New Venture P.C.  But ADAR never acted in concert with Tomer Tal or New Venture Attorneys as an investor in or lender to PUGE.

40.     On October 20, 2015, PUGE announced in its public 8-K filing that ADAR was the subject of an "investigation" and attached the text of the Civil Theft Letter.  PUGE's October 20, 2015 8K filing is attached as Exhibit M.

41.     The Civil Theft Letter constitutes the dissemination of false and misleading statements in connection with the purchase and sale of securities through the participation in a fraudulent scheme and course of conduct.  Furthermore, the information contained in the Civil Theft Letter is material.   The statements propagated therein permitted PUGE to lay blame for its poor financial condition on ADAR.  Burckhardt and PUGE's affirmative statement that, "the days of pushing this Company around are over," and that, "the remaining Note Holders should be aware that the company will pursue these matters vigorously," effectively conveyed to investors and potential investors the deceptive notion that PUGE was not responsible for the volatility of its stock or its fiscal state, and artificially influenced PUGE's perceived market value and investor perceptions of the company in the short-term.

42.     The principals of ADAR have been well-known in the investment and business community for at least 15 years.  ADAR is an accredited investor since 2014. ADAR and its principals have been in the business of providing publicly-held corporations short-term loans and have developed an established reputation among lenders and publicly-held corporations alike.  The reputation of short-term lenders, including ADAR, is important insofar as poorly-reputed short-term lenders are not

provided the same quantity and quality commercial opportunities as well-reputed short-term lenders.

43.     Upon information and belief, PUGE and/or Hermann Burckhardt's publicly disseminated and false accusations about ADAR have harmed ADAR's reputation, including its reputation in the community for stellar management, among lenders and publicly-held corporations alike.

44.     This is not the first time Mr. Burckhardt has involved himself in making false statements to a governmental agency.  In 1985, the National Association of Securities Dealers fined and censured Mr. Burckhardt for multiple violations of SEC rules with respect to broker-dealer annual reporting, audit and notification requirements.  Among the violations, Mr. Burckhardt filed inaccurate Financial and Operational Combined Uniform Single Reports ("FOCUS").  The FOCUS reports are expected to be filed monthly and quarterly and provide an update to the Firm's annual audited financial statement.  Mr. Burckhardt paid a small amount of the fine (less than 10%) then made no additional payments.  As a result, his registration as a broker-dealer was revoked.

45.     Upon information and belief, PUGE has but two directors, investors, and/or employees, including Mr. Burckhardt.[1]

46.     To date, PUGE remains in default and has yet to honor ADAR's October 14, 2015 conversion.

---

[1] In addition to Mr. Burckhardt, Thomas Jaspers serves as the company's Chief Financial Officer (CFO).

47.     At all times, ADAR has complied with to the terms of the agreements between the parties and performed those obligations required of it thereunder in every material respect.

### Fraudulent Conveyances

48.     In an effort to frustrate ADAR's ability to collect the amounts owed pursuant to the Note and SPA, PUGE and Burckhardt arranged to fraudulently transfer the few remaining PUGE assets to Burckhardt by disguising the transfers as "salary" and "benefits".

49.     Indeed, Burckhardt's alleged responsibilities and duties as CEO are largely a sham. Burckhardt has a full-time job in the warranty department of Sears and also serves as principal for an enterprise known as "Burckhardt Financial".

50.     Burckhardt performs almost no work for PUGE and admitted during deposition that he has been to the PUGE office a total of eight times since becoming CEO and forks a total of five to ten hours a week for PUGE, "if that much".

51.     Burckhardt contends that one of his obligations at PUGE is to manage the entity's employees, despite admitting that PUGE has no employees other than himself.

52.     Burckhardt suggests that one of the reasons prompting his hire was his ability to obtain financing for the company. Burckhardt would later admit that he has made no attempt to obtain financing for PUGE.

53.     As a matter of fact, Burckhardt is not qualified to be the CEO of a publicly traded company. Rather his only qualification to be the PUGE CEO seems to be his close relationship with John Lux, a friend, partner in Burckhardt Financial, and one of the architects of the Civil Theft Letter.

54.      According to PUGE's Form 8-K, filed with the SEC on October 1, 2015, Burckhardt signed a 5-year contract with PUGE. The compensation for Burckhardt's position with the company included a 10% equity interest in the company in addition to a salary of $8,000 per month for six months, escalating over the life of the agreement to a maximum of $15,000 for the last three years of the contract.

55.      Burckhardt's compensation is grossly disproportionate to the few duties he claims to perform and the marginal time he spends performing his alleged duties as CEO.

56.      Burckhardt's compensation serves as an illegal and poorly-disguised attempt to strip PUGE of its assets at the expense of the entity's shareholders and creditors.

57.      Indeed, at the time Burckhardt was hired, both PUGE and Burckhardt knew that the company was inadequately capitalized and could not afford to pay both the salary and benefits promised to Burckhardt while also maintaining sufficient capital to tender payment to its existing noteholders.

**<u>PUGE's Defaults</u>**

58.      Based on the foregoing events, PUGE's failure to honor ADAR's October 14, 2015 Notice of Conversion has effectively given rise to an "Event of Default" pursuant to the terms the Note. In addition thereto, PUGE's subsequent conduct has caused no fewer than four (4) supplemental "Events of Default" to occur.

59.      With regard to the October 14, 2015 Notice of Conversion, PUGE defaulted under §8(k), which states that an "Event of Default" shall occur if "the Company shall not deliver to the Holder the Common Stock pursuant to paragraph 4

herein without restrictive legend within 3 business days of its receipt of a Notice of Conversion." Ex. A at 5.

60.     As PUGE did not deliver the shares within three (3) business days PUGE's receipt of the Notice of Conversion, and this failure was not cured within five (5) business days, PUGE is and remains in default under §8(k).  Ex. A at 5.

61.     Second, PUGE is in default under §8(l), which provides that an "Event of Default" shall transpire if "the Company shall not replenish the reserve set forth in Section 12 within 3 business days of the request of the Holder.  Ex. A at 5.

62.     Because ADAR requested an increase in the Reserve on October 8, 2015, and again on October 12, 2015, neither of which was honored by PUGE, PUGE is in default under §8(l).   Ex. A at 5.

63.     Third, by failing to facilitate ADAR's October 14, 2015 Notice of Conversion, PUGE effectively rendered itself in default of §8(b) of the Note.  Ex. A at 4.   Section 8(b) provides that an "Event of Default" shall occur if, "[a]ny of the representations or warranties made by the Company herein or in any certificate or financial or other written statements heretofore or hereafter furnished by or on behalf of the Company in connection with the execution and delivery of this Note, or the Securities Purchase Agreement under which this note was issued shall be false or misleading in any respect."  Ex. A. at 4.

64.     Under §4 of the Note, PUGE agreed that the Holder, ADAR, would be entitled to convert all or any amount of the principal face amount of the Note then outstanding into shares of the Company's Common Stock *at its option*.  Ex. A at 5. By neglecting to effectuate ADAR's conversion, PUGE has provided to ADAR an irrevocable option to convert any or all of the remaining principal value of the Note.

65.     PUGE is further in default under §8(d) of the Note, which states, in pertinent part, that an Event of Default shall occur if: "[t]he Company shall…(2) admit in writing its inability to pay its debts generally as they mature…"

66.     In the PUGE Proposal, PUGE asserted, "As a result of the previous setbacks we lacked the ability and vision to move ahead," and, with respect to the concessions PUGE was seeking, that, "[t]he Company needs you to grant us the following terms to move forward."  In closing, the Proposal notes that, "[w]hat we are looking at if we cannot come to an agreement is a bidding war with the stock being so affected that it would probably make our business plan impractical."  The Proposal itself, conveyed to ADAR in writing, demonstrates PUGE is unable to pay its debts as they mature.

67.     PUGE further alludes to its inability to pay its debts as they become due in its September 23, 2015 filing with the Security and Exchange Commission (SEC)("Form 10-QA").  In PUGE's Form 10-QA, the company notes that, "the Company has incurred losses since inception resulting in an accumulated deficit of $1,505,530 as of July 31, 2015 and further losses are anticipated in the development of its business raising substantial doubt about the Company's ability to continue as a going concern." PUGE's September 23, 2015 10-QA is attached hereto as Exhibit N.

68.     Finally, PUGE is in default under §8(c), which mandates that an "Event of Default" shall occur if "the Company shall fail to perform or observe, in any respect, any covenant, term, provision, condition, agreement or obligation of the Company under this Note or any other note issued to the Holder."

69.     Despite the fact that, under §6 of the Note PUGE expressly waived notice, ADAR has on multiple occasions reminded PUGE of its obligations and has provided it with notice of PUGE's failure to increase the shares in its Reserve and its failure to honor ADAR's October 14, 2015 Notice of Conversion.

70.     At no point has ADAR ever, whether formally or informally, in writing or orally, waived PUGE's defaults.

71.     Section 8 of the Note outlines the negotiated-for and agreed-upon remedies for the differing Events of Default. First, §8 mandates that, "[u]pon an Event of Default, interest shall accrue at a default interest rate of 24% per annum, or if such rate is usurious or not permitted by current law, then at the highest rate of interest permitted by law."

72.     Moreover, PUGE's breaches trigger default payments of "$250 per day the shares are not issued beginning on the 4th day after the conversion notice was delivered to the Company." Beginning on the 10th day that the shares are not issued, this payment, "shall increase to $500 per day." Ex. A. at 5.

73.     Due to PUGE's persistent and willful failure to remedy its various breaches, as of filing the instant action, default interest has been accruing at a rate of 24% since September 9, 2015, or 85 days to December 3, 2015 (11/10) amounting to a total of $3,026. Further, default penalties have accrued to at least $42,000, and continue to escalate daily.

74.     The default payments under the Note were reasonable at the time of entering the contract and are not grossly disproportionate to the conceivable losses that could occur from a breach. First, stocks such as PUGE's are volatile, making the timing of conversion and sale of the stock on the open market important. Second, the ability to convert at a discount and sell on the open market, particularly in an upswing in the stock price, afforded ADAR with an opportunity to make profits well beyond the amount daily default payments.

## Irreparable Harm

75.     ADAR has been, and continues to be, irreparably harmed by PUGE's failure to honor the Notice of Conversion.

76.     First, damages from PUGE's failure to deliver the shares are inherently uncertain and difficult to calculate.  Since the parties entered in the Note in January 2015, PUGE's Stock price has ranged from $0.1 per share to just $0.0077 per share. Thus, the timing of conversions and sale of stock would be essential to the determination of damages.  Because it is impossible to discern with any accuracy precisely when ADAR would have sold the converted shares, and how many it would sell had the conversion been honored, calculating its losses is impossible.  PUGE's stock chart is attached hereto as Exhibit O.

77.     Next, PUGE is nearing insolvency, if not insolvent already.  According to PUGE's Form 10-QA (Ex. N), the company's most recent Quarterly Report filed with the Securities and Exchange Commission, PUGE is carrying over $1,650,000 million in liabilities (up from $951,229 in October 2014), compared to a mere $327,119 in total assets.  Further, PUGE's cash flows from operations evidence a net loss of $630,554 for the nine months ended July 31, 2015 and its income from operations has the company in the red for a total of ($284,434).  Finally, and most glaringly, at current, PUGE maintains a total stockholders' deficit of $838,655.

78.     PUGE's Board statements contained in the Form 10-QA reiterate this financial hardship, stating:

> The ability to continue as a going concern is dependent upon the Company generating profitable operations in the future and/or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due. Management intends to finance operating costs over the next twelve

months with existing cash on hand and loans from directors or third parties and or private placement of common stock.

79.     As such, without injunctive relief, PUGE is unlikely to satisfy any monetary judgment and ADAR will suffer irreparable harm.

## Costs, Expenses, and Attorneys' Fees

80.     The Note expressly provides that ADAR is entitled to attorneys' fees and other costs in the event of any action to enforce the terms of the Note.

81.     First, §7 of the Note states, "[t]he Company agrees to pay all costs and expenses, including reasonable attorneys' fees and expenses, which may be incurred by the Holder in collecting any amount due under this Note."

82.     Next, §8 states, "[i]f the Holder shall commence an action or proceeding to enforce any provisions of this Note, including, without limitation, engaging and attorney, then, if the Holder prevails in such action, the Holder shall be reimbursed by the Company for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding."

## First Claim For Relief
### (VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10B-5 PROMULGATED THEREUNDER)

83.     ADAR realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 82 of this Second Amended Complaint as if fully set forth herein.

84.     This claim is brought pursuant to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder against Defendants.

85.     PUGE's false allegations and omissions in its Civil Theft Letter were material in that a reasonable shareholder would consider them important in determining how to vote.

86.     The false allegations and omissions in the Civil Theft Letter are also material, in that, by offering ADAR as a scapegoat for PUGE's financial woes, the statements served to exert influence upon PUGE's securities by providing holders and potential purchasers of PUGE stock artificial confidence in the company's fiscal condition and stability.  Burckhardt benefited directly from the artificial increase in the stock price, allowing to draw an excessive salary of $8,000 per month, and his 10% shareholder interest in PUGE.

87.     In releasing the Civil Theft Letter, PUGE and Burckhardt, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of a national exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The false and misleading statements and omissions contained in the Civil Theft Letter were intended to and did, as alleged herein: (i) deceive the investing public; (ii) artificially influence the value of PUGE securities; and, (iii) cause Plaintiff and other investors damage as a result of the statements contained therein.

88.     PUGE and Burckhardt were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed, and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

89.     As described *supra*, PUGE and Burckhardt made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the investing public who relied upon such statements.

90.     The knowledge of Defendant Burckhardt, as PUGE's control person, are imputed to PUGE.

91.     Moreover, as a party to the sham alleged herein, with knowledge (through Burckhardt) that the purpose and effect of the actions described herein was to manipulate and materially misstate PUGE's financial condition to benefit Burckhardt's compensation and the value of his shares in PUGE, Burckhardt and PUGE are liability under Section 10(B) and Rule 10b-5.

92.     PUGE and Burckhardt's false statements and omissions were made in connection with the purchase and/or sale of PUGE's securities.

93.     Hermann Burckhardt's conduct constitutes a violation of fiduciary duty owed to PUGE.

94.     Burckhardt's conduct has harmed PUGE by substantially increasing PUGE's credit risk in the eyes of lending institutions and has degraded the integrity of PUGE's enterprises and securities.

95.     ADAR has standing to sue derivatively as a shareholder of PUGE.

96.     ADAR has suffered substantial damage as a result of PUGE's conduct.

97.     ADAR is therefore entitled to an award of damages in an amount to be determined at trial.

## Second Claim For Relief

(CONTROLLING PERSON LIABILITY PURSUANT TO SECTION 20(A) OF THE
SECURITIES EXCHANGE ACT OF 1934 AGAINST DEFENDANT BURCKHARDT
[BASED ON VIOLATIONS OF SECTION 10(B) AND RULE 10B-5 BY PUGE])

98.     ADAR realleges and incorporates by reference each and every allegation
contained in paragraphs 1 through 97 of this Second Amended Complaint as if fully
set forth herein.

99.     This claim is brought pursuant to Section 20(a) of the Exchange Act
against Defendant Burckhardt.

100.     Defendant Burckhardt was the controlling person of PUGE at the time
the Civil Theft Letter was disseminated as a result of his position as President and
Chief Executive Officer.

101.     By virtue of the foregoing, Burckhardt had the power to influence and
control, and did influence and control, directly or indirectly, the decision-making of
PUGE, including the content and dissemination of PUGE's financial statements and
the Civil Theft Letter.

102.     Defendant Burckhardt did not act in good faith in connection with the
conduct at issue in this claim.  Further, Burckhardt directly or indirectly induced the
act or acts constituting violations of Section 10(b) and Rule 10b-5 by PUGE, among
other things, orchestrating sham releases of materially misleading information that
caused PUGE's condition to be materially misstated, and the dissemination of false
information to investors and prospective investors.

103.     Defendant Burckhardt is liable for participation in the matters alleged
herein because he acted with knowledge that PUGE's public statements were

materially false or misleading, or omitted material information, or acted with reckless disregard for the truth.

104.     By virtue of his position as controlling person of PUGE, Defendant Burckhardt is jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act, with and to the same extent as PUGE.

## Third Claim For Relief
(BREACH OF CONTRACT: SPECIFIC PERFORMANCE)

105.     ADAR re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 104 of this Second Amended Complaint as if fully set forth herein.

106.     Pursuant to the agreements between them, PUGE is obligated to deliver 4,197,580 shares of its Common Stock, along with the necessary resolutions and acceptance of the legal opinions furnished by ADAR, sufficient to enable ADAR to sell the shares publicly without restriction.

107.     Despite its obligation to do so, PUGE has failed and refused to deliver said shares of stock to ADAR.

108.     At all times, ADAR has complied with to the terms of the agreements between the parties and performed those obligations required of it thereunder in every material respect.

109.     Pursuant to the agreements between the parties, PUGE is further obligated to increase the number of Reserved Shares so that the number of Reserved Shares equals at least 400% of the number of shares of the Company common stock required if the Note were to be fully converted.

110.    Despite its obligation to do so, PUGE has failed and refused to increase the number of Reserved Shares so that it comports to the requirements mandated by the agreements between the parties.

111.    As a result of such refusal by PUGE, ADAR has suffered damages.

112.    ADAR has no adequate remedy at law.

113.    In the absence of injunctive relief, ADAR will suffer irreparable harm.

114.    ADAR requests, therefore, that the Court enter and order requiring PUGE to deliver immediately to ADAR 4,197,901 shares of its Common Stock, along with the necessary resolutions and acceptance of the contractually required legal opinions furnished by ADAR, sufficient to enable ADAR to sell the shares publicly without restriction, and that PUGE immediately increase the number of Reserved Shares so that the number of Reserved Shares equals at least 400% of the number of shares of the Company common stock required to fulfill a conversion in the event the Note were to be fully converted.

### Fourth Claim For Relief
(BREACH OF CONTRACT: DAMAGES)

115.    ADAR realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 114 of this Second Amended Complaint as if fully set forth herein.

116.    PUGE's conduct constitutes a breach of, and default under the terms of the Note.

117.    PUGE's breach, default and conduct in connection with the Note are governed by New York law under its terms.

118.    At all times, ADAR has complied with to the terms of the agreements between the parties and performed those obligations required of it thereunder in every material respect.

119.    ADAR, therefore, is entitled to an award of damages in an amount to be determined at trial.

## Fifth Claim For Relief
### (CONVERSION: PERMANENT INJUNCTION)

120.    ADAR realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 119 of this Second Amended Complaint as if fully set forth herein.

121.    ADAR has a right to possession of the shares that PUGE has refused to deliver which right is greater than PUGE's right to possess those shares.

122.    PUGE has wrongfully interfered with ADAR's right to possess those shares which interference constituted conversion of those shares by PUGE.

123.    As a result of PUGE's wrongful conversion of the shares, ADAR has been damaged.

124.    ADAR has no adequate remedy at law.

125.    ADAR requests, therefore, that the Court enter an order requiring PUGE to deliver immediately to ADAR 4,197,901 shares of its Common Stock, along

with the necessary resolutions and acceptance of the legal opinions furnished by ADAR, sufficient to enable ADAR to sell the shares publicly without restriction.

## Sixth Claim For Relief
(CONVERSION:  DAMAGES)

126.     ADAR realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 125 of this Second Amended Complaint as if fully set forth herein.

127.     ADAR has a right to possession of the shares that PUGE has refused to deliver, which right is superior to PUGE's right to possess said shares.

128.     PUGE has wrongfully asserted dominion over the shares in question.

129.     Despite due demand, PUBE has refused to turn over the shares in question over to ADAR.

130.     PUGE has wrongfully interfered with ADAR's right to possess those shares, which interference constituted conversion of those shares by PUGE.

131.     As a result of PUGE's wrongful conversion of the subject shares, ADAR has been damaged.

132.     ADAR, therefore, is entitled to an award of damages in an amount to be determined at trial, but in any event, not less than seventy-five thousand dollars ($75,000).

## Seventh Claim For Relief
(COSTS, EXPENSES & ATTORNEYS' FEES)

133.     ADAR realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 132 of this Second Amended Complaint as if fully set forth herein.

134.     In accordance with §§7 and 8 of the agreement between the parties, PUGE agreed to pay all costs and expenses, including reasonable attorneys' fees and expenses, incurred by ADAR in collecting any amount under the Note.

135.     Section 7 of the Note states, "[t]he Company agrees to pay all costs and expenses, including reasonable attorneys' fees and expenses, which may be incurred by the Holder in collecting any amount due under this Note."

136.     Similarly, Section 8 of the Note articulates that, "[i]f the Holder shall commence an action or proceeding to enforce any provisions of this Note, including, without limitation, engaging an attorney, then, if the Holder prevails in such action, the Holder shall be reimbursed by the Company for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding."

137.     At all times, ADAR has complied with to the terms of the agreements between the parties and performed those obligations required of it thereunder in every material respect.

138.     Therefore, ADAR is entitled to an award against PUGE for costs and expenses incurred in the prosecution of this lawsuit, including reasonable legal fees.

## Eighth  Claim  For  Relief
(TORTIOUS  INTERFERENCE  WITH  PROSPECTIVE  ECONOMIC  ADVANTAGE)

139.    ADAR realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138 of this Second Amended Complaint as if fully set forth herein.

140.    ADAR's business, which consists of providing loans to distressed public companies, has been harmed by the baseless allegations of PUGE in its Civil Theft Letter.

141.    PUGE and Burckhardt have committed culpable conduct by making accusations of fraud and theft and payment of improper commissions with  at least reckless disregard of the truth.

142.    PUGE and Burckhardt made these accusations public by filing its Civil Theft Letter as part of its Form 8K submission to the (SEC).  Such filings are publicly available online through the SEC's heavily-trafficked Edgar website (URL:www.sec.gov/edgar/searchedgar/companysearch.html).

143.    Hermann Burckhardt exercises complete dominion and control over PUGE, and has caused PUGE to engage in a course of deceptive conduct, including causing PUGE to make false public accusations about Plaintiff and other lenders to the detriment of its shareholders, and for the purpose of benefiting himself individually.

144.    PUGE made, or was caused to make, its false allegations with the purpose of increasing its own stock price and personally benefiting Hermann Burckhardt.

145.    ADAR has suffered substantial damages as a result of PUGET and Mr. Burckhardt's conduct.

146.    ADAR is therefore entitled to an award of damages in an amount to be determined at trial.

## Ninth Claim For Relief
(PIERCING THE CORPORATE VEIL)

147.    ADAR realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 146 of this Second Amended Complaint as if fully set forth herein.

148.    Mr. Burckhardt recently caused PUGE to sign an employment contract for a 5-year term whereby Mr. Burckhardt will receive an excessive compensation of $8,000 per month for the first six months of his employment to a maximum of $15,000 per month for the last three years of the contract.

149.    Mr. Burckhardt has admitted on a number of occasions to inadequate capitalization of PUGE, a function of Mr. Burckhardt's mismanagement of its assets.

150.    Mr. Burckhardt's manages PUGE as an alter ego of himself personally.

151.    ADAR has suffered substantial damages as a result of PUGE's conduct.

152.    Therefore, ADAR is entitled to pierce the corporate veil, and allowing damages for Mr. Burckhardt's deceptive conduct to be paid from Mr. Burckhardt personally.

## Tenth Claim For Relief
### (DEFAMATION)

153.    ADAR realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 152 of this Second Amended Complaint as if fully set forth herein.

154.    ADAR is not a public figure.

155.    Mr. Burckhardt and PUGE's statements in its published Civil Theft Letter were false or at least made in reckless disregard of the truth, and were otherwise grossly irresponsible in that the statements were made without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties. The false statements were of a character that would tend to injure a person in his business trade or profession.

156.    ADAR has suffered substantial and special damage as a result of PUGE and Burckhardt's conduct in New York and elsewhere as a result of PUGET's conduct.

157.    ADAR is therefore entitled to an award of damages in an amount to be determined at trial.

## Eleventh Claim For Relief
### (DCL §273)

158.    ADAR realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 157 of this Second Amended Complaint as if fully set forth herein.

159.    Debtor and Creditor Law Section 273 articulates that:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without fair consideration.

160.     In an effort to frustrate ADAR's ability to collect the amounts owed pursuant to the SPA and Note, PUGE and Burckhardt arranged to fraudulently transfer the few remaining PUGE assets to Burckhardt by disguising the transfers as "salary" and "benefits".

161.     In fact, Burckhardt's purported duties as CEO are largely a sham. Burckhardt has a full time job in the warranty department of Sears and also runs a business called Burckhardt Financial.

162.     Burckhardt performs almost no work for PUGE and admitted at his deposition that he has been to the PUGE offices a total of eight times since becoming CEO and works a total of five to ten hours a week for PUGE "if that much."

163.     In fact, My Burckhardt is not qualified to be the CEO of a publicly traded company. Rather, his only qualification to be the PUGE CEO seems to be his close relationship with John Lux, his friend and partner in Burckhardt Financial and one of the architects of the Civil Threat Letter.

164.     According to PUGE's Form 8-K, filed with the SEC on October 1, 2015, Burckhardt signed a 5-year contract with PUGE. The compensation for Burckhardt's position with PUGE has granted him a 10% interest stake in the company in addition to salary of $8,000 per month for six months, which escalates over the life of the contract to a maximum of $15,000 for the last 3 years of the contract.

165.    Burckhardt's compensation is grossly disproportionate to the limited duties he claims to perform and the marginal time he spends performing his alleged duties as CEO.

166.    The conveyances to Burckhardt in the form of salary and benefits were and are made without fair consideration.

167.    As a result of these conveyances, PUGE has been rendered insolvent.

168.    The transfers are fraudulent as to creditors, including ADAR.

169.    Consequently, Defendants have violated DCL § 273 as set forth above.

170.    By reason of the foregoing, a judgment should be entered unwinding the conveyances and directing Defendants to deliver the money, shares and other compensation paid to Burckhardt, and other funds and/or assets originally belonging to PUGE and rightfully due and owing to ADAR, together with interest accrued thereupon, and for such other and further relief as to this Court may seem just and proper.

## Twelfth Claim For Relief
### (DCL §274)

171.    ADAR realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 170 of this Second Amended Complaint as if fully set forth herein.

172.    In an effort to frustrate ADAR's ability to collect the amounts owe3d pursuant to the SPA and the Note, PUGE and Burckhardt arranged to fraudulently

transfer the few remaining PUGE assets to Burkhardt by disguising the transfers as "salary" and "benefits".

173.    However, Burckhardt's alleged responsibilities and duties as CEO are largely a sham.  Burckhardt has a full-time job in the warranty department of Sears and also serves as principal for an enterprise known as "Burckhardt Financial".

174.    Burckhardt performs almost no work for PUGE and admitted during deposition that he has been to the PUGE office a total of eight times since becoming CEO and forks a total of five to ten hours a week for PUGE, "if that much".

175.    In fact, Burckhardt is largely unqualified to act as the CEO of a publicly traded company.  Rather, his sole qualification appears to be that the PUGE CEO has a close relationship with John Lux, a friend, partner in Burckhardt Financial and one of the architects of the Civil Theft Letter.

176.    According to PUGE's Form 8-K, filed with the SEC on October 1, 2015, Burckhardt signed a 5-year contract with PUGE. The compensation for Burckhardt's position with PUGE has granted him a 10% interest stake in the company in addition to salary of $8,000 per month for six months, which escalates over the life of the contract to a maximum of $15,000 for the last 3 years of the contract.

177.    Burckhardt's compensation is grossly disproportionate to the few duties he claims to perform and to the marginal amount of time he spends performing his supposed duties as CEO.

178.    Upon information and belief, the compensation paid to Burckhardt was for no consideration or inadequate consideration, and was solely to frustrate creditors.

179.   The fraudulent transfers to Burckhardt in the form of salary and benefits left PUGE with little or no capital.

180.   PUGE does not have sufficient assets to pay his debts and was therefore left with "unreasonably small capital."

181.   Defendants have violated § 274 as set forth above.

182.   By reason of the foregoing, a judgment should be entered unwinding the conveyances, and directing defendants to deliver the money, shares, and other compensation paid to Burckhardt, and other funds and/or assets originally belonging to PUGE and rightfully due and owing to ADAR, together with interest accrued thereon and for such further and other relief as to this Court may seem just and proper.

## Thirteenth Claim for Relief
(DCL § 275)

183.   ADAR realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 182 of this Second Amended Complaint as if fully set forth herein.

184.   Debtor and Creditor Law § 275 provides:

> Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

185.   In an effort to frustrate ADAR's ability to collect the amounts owed pursuant to the SPA and Note, PUGE and Burckhardt arranged to fraudulently

transfer the few remaining PUGE assets to Burckhardt by disguising the transfers as "salary" and "benefits".

186.   Burckhardt's purported duties as CEO are largely a sham. Burckhardt has a full time job in the warranty department of Sears and also runs a business called Burckhardt Financial.

187.   Burckhardt performs almost no work for PUGE and admitted at a recent deposition that he has been to the PUGE offices a total of eight times since becoming CEO and works a total of five to ten hours a week for PUGE "if that much".

188.   In fact, Mr. Burckhardt is not qualified to be the CEO of a publically traded company.  Rather, his only qualification to be the PUGE CEO seems to be his close relationship with John Lux, his friend and partner in Burckhardt Financial and the architect of the Civil Threat Letter

189.   According to PUGE's Form 8-K, filed with the SEC on October 1, 2015, Burckhardt signed a 5-year contract with PUGE. The compensation for Burckhardt's position with PUGE has granted him a 10% interest stake in the company in addition to salary of $8,000 per month for six months, which escalates over the life of the contract to a maximum of $15,000 for the last 3 years of the contract.

190.   Burckhardt's compensation is grossly disproportionate to the few duties he claims to perform and to the marginal amount of time he spends performing his supposed duties as CEO.

191.   PUGE and Burckhardt were well aware of their debts or impending debts to ADAR at the time that they made the transfers to Burckhardt for little or no consideration for the purpose of frustrating their creditors.

192.   PUGE and Burckhardt were aware at the time of the transfers that PUGE had incurred debts beyond its ability to pay as the debts matured.

193.   Defendants have violated Debtor and Creditor Law § 275.

194.   By reason of the foregoing, a judgment should be entered unwinding the conveyances, and directing defendants to deliver the money, shares, and other compensation paid to Burckhardt, and other funds and/or assets originally belonging to PUGE and rightfully due and owing, to ADAR, together with interest accrued thereon and for such further and other relief as to this Court may seem just and proper.

## Fourteenth Claim For Relief
(DCL § 276)

195.   ADAR realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 195 of this Second Amended Complaint as if fully set forth herein.

196.   Debtor and Creditor Law § 276 provides:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

197.    In an effort to frustrate ADAR's ability to collect the amounts owed pursuant to the SPA and Note, PUGE and Burckhardt arranged to fraudulently transfer the few remaining PUGE assets to Burckhardt by disguising the transfers as "salary" and "benefits".

198.   Burckhardt's purported duties as CEO are largely a sham.  Burckhardt has a full-time job in the warranty department of Sears and also runs a business called Burckhardt Financial.

199.   Burckhardt performs almost no work for PUGE and admitted at a recent deposition that he has been to the PUGE offices a total of eight times since becoming CEO and works a total of five to ten hours a week for PUGE "if that much".

200.   In fact, Mr. Burckhardt is not qualified to be the CEO of a publically traded company.  Rather, his only qualification to be the PUGE CEO seems to be his close relationship with John Lux, his friend and partner in Burckhardt Financial and one of the architects of the Civil Theft Letter.

201.   According to PUGE's Form 8-K, filed with the SEC on October 1, 2015, Burckhardt signed a 5-year contract with PUGE. The compensation for Burckhardt's position with PUGE has granted him a 10% interest stake in the company in addition to salary of $8,000 per month for six months, which escalates over the life of the contract to a maximum of $15,000 for the last 3 years of the contract.

202.   Both Burckhardt and PUGE were aware of the debt owed to ADAR when they transferred the assets and funds to Burckhardt as noted above.

203.   Burckhardt and PUGE made the transfers with intent "to hinder, delay, or defraud" ADAR and render its judgment ineffectual.

204.   Additionally, the transfers contain numerous indicia of fraud.

205.   First, the transfers were made to Burckhardt, who is a close friend and business partner of John Lux, PUGE's attorney.

206.    Second, the transfers were made at a time when PUGE had incurred debts to ADAR and numerous other noteholders, and attempting to avoid paying those debts.

207.    Third, PUGE was inadequately capitalized at the time of the transfers, and knew that it could not both pay Burckhardt an exorbitant salary and benefits and also pay its noteholders.

208.    Fourth, the transfers were made without adequate consideration as Burckhardt performed almost no work for PUGE and maintained at least two other jobs, including a full time job at Sears.

209.    Fifth, Burckhardt is unqualified to be the CEO of a public company.

210.    Accordingly, each of the transfers to Burckhardt were a violation of DCL § 276.

211.    By reason of the foregoing, a judgment should be entered unwinding the conveyances, and directing defendants to deliver the money, shares, and other compensation paid to Burckhardt, and other funds and/or assets originally belonging to PUGE and rightfully due and owing to ADAR, together with interest accrued thereon and for such further and other relief as to this Court may seem just and proper.

### Fifteenth Claim for Relief
(Attorney's Fees Pursuant to DCL 276(a))

212.    ADAR realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 211 of this Second Amended Complaint as if fully set forth herein.

213.    Defendants made the above transfers with actual intent to defraud creditors. Defendants are therefore required to pay Plaintiff's attorney fees Pursuant to Debtor and Creditor Law § 276-a.

214.    By reason of the foregoing, a judgment should be entered directing defendants to pay all attorney's fees incurred by plaintiff and for such further and other relief as to this Court may seem just and proper.

## Prayer For Relief

**WHEREFORE**, Plaintiff ADAR BAYS, LLC seeks judgment against Defendant PUGET TECHNOLOGIES, INC. as follows:

i.    On the First Claim for Relief, for damages in an amount to be determined, but not less than One Hundred Thousand Dollars ($100,000.00); and

ii.    On the Third and Fifth Claims for Relief, ADAR requests an order requiring PUGE to immediately deliver to ADAR 4,197,901 shares of its Common Stock, along with the necessary resolutions and acceptance of the contractually required legal opinions furnished by ADAR, sufficient to enable ADAR to sell the shares publicly without restriction; and

iii.    On the Third Claim for Relief ADAR further requests an order requiring PUGE to increase the reserves of its Common Stock by an additional 77,391,304 shares; and

iv.    On the Seventh Claim for Relief for an award of ADAR's costs and expenses in prosecuting this action, including reasonable legal fees as required under the terms of the Note; and

v.      On the Eighth and Tenth Claims for Relief, the issuance of an injunction requiring PUGE to amend its October 20, 2015 8K filing and to refrain from further interference with ADAR's prospective economic advantage and further requiring PUGE to file a statement with the SEC that that Court has found PUGE had made misrepresentations of fact in its October 20, 2015 8K filing order and required PUGE to amend said filing on that basis; and

vi.      On the Second and Ninth Claims for Relief, an order allowing Mr. Burckhardt to be held personally liable for all acts of self-dealing and violation of fiduciary duty to PUGE; and

vii.      On the Eleventh, Twelfth, Thirteenth and Fourteenth Claims for Relief, a judgment to unwind the conveyances, and directing PUGE and Burckhardt to deliver all monies, shares and other compensation paid to Burckhardt, and other funds and/or assets originally belonging to PUGE and rightfully due and owing to ADAR; and

viii.      On the Fifteenth Claim for Relief, an award of ADAR's costs and expenses in prosecuting this action, including reasonable legal fees; and

ix.      On all Claims for Relief, an order requiring PUGE to take all necessary steps to increase the authorized shares of PUGE so as to comply fully with the terms of the Note; and

x.      On all Claims for Relief, for damages in an amount to be determined, but not less than one hundred thousand dollars ($100,000); and

xi.      On all Claims for Relief, for interest, attorneys' fees and the costs and disbursements of this action; and

xii.     For such other further relief as the Court may deem just, proper, and in the interest of justice.

## JURY DEMAND

Plaintiff demands a trial by jury in this matter.

Dated:        New York, New York
              September 1, 2016

RESPECTFULLY SUBMITTED,
**GARSON, SEGAL,
STEINMETZ, FLADGATE LLP**
*ATTORNEYS FOR PLAINTIFF*

**BY:**

_____/S/_____
MICHAEL M. STEINMETZ
KEVIN MURPHY (KM-2370)
164 WEST 25TH STREET
SUITE 11R
NEW YORK, NY 10001
**TELEPHONE:** (212) 380-3623
**FACSIMILE:** (347) 537-4540
**EMAIL:** KM@GS2LAW.COM